Linda FAAS, Plaintiff

v.

WASHINGTON COUNTY and Joseph Tibbetts, individually and in his official capacity as Sheriff of Washington County, Defendants

No. CIV.02–94–B–S.

United States District Court, D. Maine.

May 2, 2003.

Dale F. Thistle, Law Office of Dale F. Thistle, Newport, ME, for Linda Faas, Plaintiff.

Peter T. Marchesi, Wheeler & Arey, P.A., Waterville, Norman P. Toffolon, Machias, ME, for Washington, County of, Joseph Tibbetts, William Sinford, Defendants.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Senior District Judge.

Plaintiff's Complaint includes five separate claims: violation of federal civil rights, 42 U.S.C. § 1983 (Count I); sexual assault under Maine criminal law, 17–A M.R.S.A. § 253 (Count II); intentional infliction of emotional distress (Count III); negligent infliction of emotional distress (Count IV); and violation of civil rights under Maine law, 5 M.R.S.A. § 4681 *et seq.* Now before the Court is Defendants Washington County and Joseph Tibbetts's Motion for Summary Judgment requesting the Court to enter summary judgment on Counts I, III, IV, and V of Plaintiff's Complaint. *See* Defendant Washington County and Joseph Tibbetts's Motion for Judgment on the Pleadings and for Summary Judgment (Docket Item No. 11). Defendants also request that the Court enter judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, on Count II of Plaintiff's Complaint. By agreement of the parties, the Court will grant Defendants' Motion for Judgment on the Pleadings with respect to Count II. The Court will grant in part and deny in part Defendants' Motion for Summary Judgment. Defendants have also filed a Motion to Strike which the Court will grant in part and deny in part.

### I. Summary Judgment Standard

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *United States Steel v. M. DeMatteo Constr. Co.*, 315 F.3d 43, 48 (1st Cir.2002). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93–94 (1st Cir.2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995)). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir.2000). Once the moving party has made a preliminary showing that no genu-

ine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir.1999) (citation and internal punctuation omitted); Fed.R.Civ.P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir.2001) (citation and internal punctuation omitted).

 As Defendants observe, Plaintiff Faas fails to respond to (*i.e.*, admit, deny, or qualify) their material facts as required by Local Rule 56(c), although she does submit a separate statement of additional facts. *See* Plaintiff's Statement of Contested Material Facts (Docket Item No. 23). Accordingly, per Local Rule 56(e), Defendants' statements are deemed admitted to the extent they are properly supported by the record citations given. In keeping with this rule, Plaintiff's additional facts are considered only to the extent they do not contradict such of Defendants' facts as are deemed admitted.[1]

## II. Motion to Strike

 Also pending before the Court is Defendants' Motion to Strike Affidavits and/or Portions of Affidavits of Linda Faas, Marni Taylor, Nicole Bouchard, Jamie Campbell and Marie Gabreil and Request for Sanctions (Docket Item No. 32).

In their Motion to Strike, Defendants' advance three separate grounds to strike all or parts of the five affidavits. Specifically, Defendants argue that portions of the affidavits are improper for the Court to consider on summary judgment because (1) with the exception of the affidavit of Linda Faas, all the affidavits are from witnesses who have never been identified by Plaintiff in initial disclosures and, thus, violate Federal Rule of Civil Procedure 26(a)(1), (2) substantial portions of the affidavits are not referred to in Plaintiffs Statement of Contested Material Facts, and (3) portions of the affidavits would not be admissible in evidence. After consideration of the motion, the Court will grant the motion as to those statements which would not be admissible in evidence because they lack foundation, represent hearsay, or are not made on personal knowledge. Pursuant to Local Rule 56, as discussed above, the Court will also grant Defendants' motion to the extent it seeks to strike those portions of the affidavits that are not referred to in Plaintiff's Statement of Contested Material Facts. The Court will, however, deny Defendants' requests for sanctions and to strike the affidavits for failure to timely disclose, made pursuant to Rules 26(c)(1) and 37(c)(1).

## III. Facts

Defendant William Sinford was employed as a corrections officer by the Washington County Jail on a part-time basis beginning on August 16, 1988, and on a full-time basis beginning on March 5,

---

1. The Court has permitted only two additional facts submitted by Plaintiff in support of her Statement of Contested Material Facts to supplement Defendants' statement of fact for purposes of deciding the Motion for Summary Judgment: specifically, the statement by Plaintiff that she observed "corrections officer Jason Falkingham masturbate . . . in front of Angel Hinckley" outside her cell, Affidavit of Linda Faas ¶ 4 (cited in Plaintiff's Statement of Contested Material Facts ¶ 1), and the statement by Jamie Campbell that she had "sexual encounters" with corrections officer Tim Gross while incarcerated at the Washington County Jail, Affidavit of Jamie Campbell ¶ 6 (cited in Plaintiff's Statement of Contested Material Facts ¶ 1).

1989. Affidavit of Robert Gross ¶ 2 (hereafter "Gross Aff."); *see generally,* Deposition of William Sinford at 11–12 (hereafter "Sinford Dep."), and was a sergeant at the time of the events alleged in Plaintiffs Complaint. *See* Sinford Dep. at 20. Sinford received initial "AB" training when he was first hired by the Washington County Sheriffs Department, which he was required to complete before he could begin work as a corrections officer. He received further training from the Maine Criminal Justice Academy to become certified as a full-time corrections officer, and he continued to receive in-service training throughout the term of his employment with the Washington County Sheriffs Department. Sinford Dep. at 60–61. Sinford was also a part-time deputy in the patrol/law enforcement division of the Washington County Sheriffs Department. Deposition of Joseph Tibbetts at 24 (hereafter "Tibbetts Dep."); Sinford Dep. at 57.

The Washington County Sheriffs Department is comprised of the patrol/law enforcement division, the corrections division, and the communications department. *See* Tibbetts Dep. at 3; Tibbetts Aff. ¶ 3; Sinford Dep. at 57. Plaintiff Linda Faas was sexually assaulted by Defendant Sinford on June 18, 2001. Specifically, Sinford required the Plaintiff to show him her breasts and to place his penis in her mouth, and Sinford masturbated onto Plaintiffs' person. Deposition of Linda Faas at 107–21 (hereafter referred to as "Faas Dep."). Defendant Sinford again sexually assaulted Plaintiff, sometime after June 18, 2001, when he forced her between the washer and dryer of the jail laundry, where Plaintiff was working, and inserted his finger into Plaintiffs vagina. Faas Dep. at 145–49. Defendant Sinford knew at all times that jail employees were not permitted to have sexual contact with inmates. Sinford Dep. at 63, 64, 76.

In this case, the first information that Tibbetts had regarding Plaintiffs allegations came from Jail Administrator Robert Gross, who received a report from another inmate, Brace Ashby, that an inmate was setting the County up for a lawsuit by having sexual relations with Defendant Sinford. Tibbetts Dep. at 61; Affidavit of Robert Gross ¶ 3. Sheriff Tibbetts instructed Robert Gross to investigate the allegations. Gross Aff. ¶ 4. Robert Gross met with Ashby and ascertained the identity of the inmate and the officer. Gross Aff. ¶ 5. Tibbetts and Robert Gross met privately with Plaintiff, informed Plaintiff of the allegations, and asked her whether she had had any sort of sexual contact with Defendant Sinford or whether Sinford had in any way acted inappropriately toward her. Tibbetts Dep. at 61; Gross Aff. ¶ 6; Faas Dep. at 167–168. Plaintiff denied that she had had any sexual contact with Sinford and denied that Sinford had acted inappropriately towards her in any way, Faas Dep. at 167–68; Tibbetts Dep. at 61; Gross Aff. ¶ 7, and Plaintiff specifically praised Sinford and another jail employee. Tibbetts Dep. at 61. Tibbetts and Robert Gross also met with Defendant Sinford, informed him of the allegations, and questioned him as to whether the allegations were true or whether he had had any inappropriate contact or relationship with Plaintiff. Tibbetts Dep. at 61; Gross Aff. ¶ 8. Sinford denied having any inappropriate contact or relationship with Plaintiff. Tibbetts Dep. at 61; Gross Aff. ¶ 9.

When Plaintiff was released from the Washington County Jail after serving her sentence, she presented jail officials with a grievance alleging that Sinford had sexually assaulted her.[2] Faas Dep. at 168; Tib-

2. Tibbetts had no actual knowledge of, or actual involvement in, the allegations made

betts Dep. at 62; Tibbetts Aff. ¶ 4. Upon receiving the grievance, Tibbetts instructed Chief Deputy Sidney Hughes to issue a letter to Sinford suspending him from his remaining duties as a part-time corrections officer, without pay. Tibbetts Dep. at 26, 62; Tibbetts Aff. ¶ 4. Tibbetts immediately assigned Detective David Denbow of the Washington County Sheriffs Department to conduct an official investigation into the allegations made in Plaintiffs grievance. Tibbetts Dep. at 46, 62; Tibbetts Aff. ¶ 4. Detective Denbow informed Tibbetts that he believed that Plaintiffs allegations had some merit and warranted further formal investigation, and he referred the matter to the Attorney General's Office and subsequently to the Maine State Police. Tibbetts Aff. ¶¶ 5, 6.

"Sexual encounters" also took place in the Washington County Jail between inmate Jamie Campbell and corrections officer Tim Gross. *See* Affidavit of Jamie Campbell ¶ 6 (cited in Plaintiff's Statement of Contested Material Facts ¶ 1). Another incident of inappropriate sexual conduct took place outside Ms. Faas's cell in the

jail. On that occasion, Ms. Faas witnessed "corrections officer Jason Falkingham masturbate . . . in front of Angel Hinckley." Affidavit of Linda Faas ¶ 4 (cited in Plaintiff's Statement of Contested Material Facts ¶ 1).

There have also been several occasions in the past where third persons have alleged that an inmate at the Washington County Jail and a jail employee had had consensual sexual relations. Tibbetts Dep. at 60. Each of those allegations was investigated, including interviewing the inmate and the jail employee alleged to be involved. Tibbetts Dep. at 60. On each occasion, the allegations were ultimately determined to be unfounded because there was no evidence to corroborate them, and the employees and inmates allegedly involved each denied any improper conduct.[3] Tibbetts Dep. at 60–61.

Sinford was trained, both as a corrections officer and a part-time deputy, with respect to the contents of the Washington County Sheriffs Department manual of

by Plaintiff until they were brought to his attention by Robert Gross in August of 2001. Tibbetts Aff. ¶ 8. There is no officially promulgated policy of Washington County which permits or condones jail employees having any personal or sexual relationships with inmates, whether consensual or otherwise. Tibbetts Aff. ¶ 7.

3. There have also been three occasions where an employee is alleged to have had dealings with inmates that were not sexual, but that were not strictly employment related and were personal in nature. Tibbetts Dep. at 35–39, 56–60. In each of those cases, the allegations were investigated, and remedial action was taken. *Id.* Specifically, in April of 2001, a corrections officer was found to have taken information from an inmate and to have passed it on to a third person outside of the jail. That corrections officer was terminated. Tibbetts Dep. at 56–57. In May, 2001, a jail employee was alleged to have received a large number of telephone calls at home from an

inmate in another jail. Tibbetts Dep. at 57–58. Tibbetts had Robert Gross investigate the allegations. Robert Gross traveled to the jail in the other county, interviewed the inmate, reviewed jail telephone records, and verified that the allegations were true. Gross Aff. ¶ 11. That particular employee was terminated and/or resigned, even though the phone calls were made by an inmate from another jail and even though the Washington County Jail employee received the phone calls at home. Tibbetts Dep. at 39; Gross Aff. ¶ 12. In May of 1999, Tibbetts received allegations that a corrections officer sent an e-mail to a third person on behalf of an inmate. Tibbetts Dep. at 37, 69. Tibbetts had Robert Gross and Denbow investigate those allegations, and it was determined that the allegations were substantiated. Tibbetts Dep. Exhibit E. The corrections officer was suspended without pay for a week and required to undergo remedial training. Tibbetts Dep. at 39, 59–60; Tibbetts Dep. Exhibit E.

policies and procedures, and he was required to abide by certain of those procedures, including those in the section entitled "Prohibited Conduct." Tibbetts Dep. at 20, 21, 53–55; Affidavit of David Brown ¶¶ 3, 4 (hereafter "Brown Aff."). The Washington County Sheriffs Department manual of policies and procedures, in Rules and Regulations 1–6, prohibits officers from engaging in "conduct unbecoming of an officer," which includes "the commission on or off duty of any specific act or acts, or relationships of immoral, improper, disorderly or intemperate personal conduct which reflects discredit upon the officer himself, upon his fellow officers, or upon the Sheriffs Department." Tibbetts Dep. at 55, 56; Brown Aff. ¶ 5. The Washington County Sheriffs Department manual of policies and procedures also prohibits employees from engaging in "the commission of any felony or misdemeanor, or the violation of the criminal laws or statutes of the United States or of any local jurisdiction." Tibbetts Dep. at 56; Brown Aff. ¶ 6. Sinford was trained by Brown in the policies and procedures of Washington County Sheriff's Department. Brown Aff. ¶¶ 5–7.

In addition, Sinford received sexual harassment training while he was employed at the Washington County Jail. Brown Aff. ¶¶ 7–8; Tibbetts Dep. at 17. Brown provided the sexual harassment training to Sinford and others and provided Sinford with the County's policy on sexual harassment, which prohibits, among other things, unwanted comments or touching of a sexual nature. Brown Aff. ¶ 7. As part of the training provided by Brown to Sinford and others on the issue of sexual harassment, Brown trained Sinford that the policy related not only to conduct toward other County employees, but also toward inmates or any other third persons with whom the County employees came in contact during the performance of their duties. Brown Aff. ¶ 5. Sinford also received training in inmate supervision. Brown Aff. ¶ 9. The training provided by Brown to Sinford and others with respect to inmate supervision stressed that jail employees should not have any contact with inmates other than contact of a professional nature, that jail staff members should not become overly friendly or familiar with inmates, and should not engage in actions or discussions of a sexual nature with inmates. Brown Aff. ¶¶ 9, 10.

Sheriff Joseph Tibbetts is the final decision-maker/policymaker at the Washington County Jail. Tibbetts retains the authority to make all final decisions regarding jail training, jail policies and procedures, investigations of allegations regarding improper conduct of employees, discipline of employees, and jail operational matters. Tibbetts Aff. ¶ 3. Other than the allegations made by Plaintiff in this case, neither Tibbetts nor the Jail Administrator, Robert Gross, have ever received any complaints or reports from any person regarding sexual assaults by jail employees on jail inmates. Tibbetts Aff. ¶ 9; Gross Aff. ¶ 10. Sinford worked as an employee of the jail until he voluntarily resigned his position as a corrections officer effective August 10, 2001, and told Sheriff Tibbetts that he was tendering his resignation. Tibbetts Dep. at 62–63.

### IV. Discussion

#### A. Municipal Liability—42 U.S.C. § 1983 and 5 M.R.S.A. § 4681 *et seq.* (Counts I and V)[4]

Plaintiff's Complaint alleges violations of her civil rights based on the Fourth, Fifth,

---

**4.** The Court's analysis of Plaintiff's federal civil rights claim, 42 U.S.C. § 1983, and

Maine Civil Rights Act claim, 5 M.R.S.A. § 4681 *et seq.*, are identical. *See, e.g., Com-*

Eighth, and Fourteenth Amendments to the United States Constitution. Specifically, Plaintiff asserts that the constitutional violations she suffered resulted from (1) official policies of Washington County and Sheriff Tibbetts, (2) widespread and pervasive customs of Washington County and Sheriff Tibbetts, and (3) the deliberately indifferent failure on the part of Washington County and Sheriff Tibbetts to train its employees in matters relating to sexual and/or personal contact with inmates. *See* Complaint (Docket Item No. 1) ¶¶ 28–29. The Court will, therefore, consider below all three avenues for municipal liability.

In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held for the first time that municipalities could be sued under section 1983. The Court pronounced, however, that the common law doctrine of *respondeat superior,* whereby employers are held vicariously liable for the wrongful acts of their employees, is not applicable to section 1983 claims. *Id.* at 692, 98 S.Ct. at 2036. Rather, a municipality may be liable under section 1983 only if there is a showing that a "policy or custom" of the municipality caused a constitutional tort. *Id.* at 694, 98 S.Ct. at 2037.

 As with any other tort claim, there must be a showing in a section 1983 action of "a direct causal link" between the municipal policy or custom and the alleged constitutional deprivation. *Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). In applying *Monell,* courts have struggled to determine just which sorts of municipal wrongdoing may properly be said to have caused constitutional violations. *See Canton,* 489 U.S. at 385–86, 109 S.Ct. at 1203 (noting that this inquiry has left the Supreme

Court "deeply divided"). Nonetheless, several general comments about the scope of municipal liability can be made. An unmistakable basis for municipal liability is the enforcement by the municipality of an unconstitutional regulation, ordinance, or written policy. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). However, a more common situation is one where unwritten or informal municipal policies produced the constitutional violation at issue. In such circumstances, it may be difficult to distinguish an official policy from simply a pattern of behavior by municipal employees. The Supreme Court has made it clear that for a policy to exist, it must be the result of a "deliberate choice to follow a course of action ... from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483–84, 106 S.Ct. at 1300–01.

Another basis for municipal liability arises out of an unconstitutional "custom or practice" if it is "so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet [do] nothing to end the practice." *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.1989). Unlike a "policy," which comes into existence because of the top-down affirmative decision of a policymaker, a "custom or practice" develops from the bottomup. Thus, the liability of the municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance of or acquiescence in it. *Id.*

### 1. Policy

 A "policy" may be established by either a policy or decision adopted by the

*fort v. Town of Pittsfield,* 924 F.Supp. 1219 (D.Me.1996).

municipality or a single act of a municipal official with final policymaking authority. *See St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). There is no evidence in this summary judgment record upon which a reasonable jury could find the existence of an official policy or decision adopted by Washington County which caused harm to Plaintiff. *See* Tibbetts Aff. ¶ 7. In addition, there is no evidence that Sheriff Tibbetts, the official with final policymaking authority, had any involvement in the sexual assault of Plaintiff. Tibbetts Aff. ¶ 8. The Court will grant Defendants' Motion for Summary Judgment with respect to that part of Counts I and V alleging that Plaintiff's constitutional rights were violated as a result of a municipal policy.

### 2. Custom or Practice

■ Plaintiff must meet two requirements to maintain a § 1983 claim grounded upon an unconstitutional municipal custom or practice. First, as noted above, the custom or practice must be attributable to the municipality; *i.e.,* it must be "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *See Bordanaro,* 871 F.2d at 1156. Second, the custom must have been the cause of and "the moving force" behind

the deprivation of constitutional rights. *Id.* at 1157.

■ The record presents undisputed evidence of inappropriate sexual relationships between three individual Washington County corrections officers and three different inmates. Indeed, it appears that the sexual misconduct that occurred between officer Tim Gross and Jamie Campbell was ongoing in nature. *See* Affidavit of Jamie Campbell ¶ 6 (cited in Plaintiff's Statement of Contested Material Facts (Docket Item No. 23) ¶ 1). On two separate occasions, Plaintiff was sexually assaulted by Sinford. Faas Dep. at 107–21, 145–49. *See also Bordanaro,* 871 F.2d at 1156 ("Additional support for the existence of such a practice can be inferred from the event itself."). Plaintiff also witnessed "corrections officer Jason Falkingham masturbate ... in front of Angel Hinckley." Affidavit of Linda Faas ¶ 4 (cited in Plaintiff's Statement of Contested Material Facts). Defendants argue that evidence of consensual sexual relationships between corrections officers and inmates cannot support Plaintiff's claims here. The Court disagrees. Sexual misconduct by the corrections officers toward inmates, consensual or otherwise, if it were a common practice, may have contributed to the environment in which, ultimately, Plaintiff was sexually assaulted.[5] Therefore, with

---

**5.** Viewing the evidence in the light most favorable to the Plaintiff, Sheriff Tibbetts's knowledge of inappropriate personal relationships between officers and inmates, even though not shown to be sexual in nature, may also be relevant to the issues raised in this case. Defendants appear to include the facts regarding three instances of inappropriate personal relationships between officers and inmates to support their claims that in conducting these investigations, and ultimately taking disciplinary action, illustrates generally that when they become aware of allegations of officer misconduct, Defendant Tibbetts and the County take reasonable steps to address the situation. Indeed, Defendant Tibbetts's discipline of officers arising out of inappropriate personal relationships with inmates may be relevant to the issue of whether Defendants take reasonable steps to deal with personnel problems generally. On the other hand, a jury may conclude that given the personal relationships between the officers and inmates involved in those situations, Sheriff Tibbetts had some actual or constructive knowledge that there were inappropriate relationships being formed between officers and inmates at the jail. *See Bordanaro,* 871 F.2d at 1157 (Custom or practice may be "so widespread or flagrant that in the proper ex-

respect to municipal custom or practice, the Court concludes that there are issues of fact which prevent entry of summary judgment in favor of Defendants regarding whether the practice by corrections officers of sexual misconduct with inmates was so "widespread that the policymaking officials of the municipality ... [had] constructive knowledge of it and yet did nothing to end the practice" and that such practice caused the deprivation of Plaintiff's constitutional rights. The Court will, therefore, deny Defendants' Motion for Summary Judgment on those parts of Counts I and V alleging that Plaintiff's constitutional rights were violated as a result of a municipal custom or practice.

### 3. Failure to Train

▮▮▮ Another category of section 1983 cases which results in municipal liability arises in so-called "failure to train" context. This category overlaps the three mentioned above, since a failure to train employees can, presumably, be the product of a written or unwritten policy, or of a municipal custom. Moreover, the existence of an unconstitutional municipal custom may create a need to train employees on how to behave constitutionally. *See Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. at 1205 n. 10; *Bordanaro,* 871 F.2d at 1155–63. What distinguishes "failure to train" cases, however, is that there need not be a systematic unconstitutional practice (*i.e.,* a policy or a custom) for liability to attach. Rather, liability results when (1) there is a constitutional violation by a municipal employee and (2) the evidence demonstrates a close causal link between the failure to train and the injury. *See Collins v. City of Harker Heights,* 503 U.S. 115, 122–25, 112 S.Ct. 1061, 1067–1068, 117 L.Ed.2d 261 (1992). Given the indefinite nature of

judgments about the appropriate level of training for municipal employees has led the Supreme Court to express concern that failure-to-train actions "would open municipalities to unprecedented liability under § 1983." *Canton,* 489 U.S. at 391, 109 S.Ct. at 1206. Accordingly, the Court has limited failure-to-train liability to the most egregious cases. A municipality will be held liable only if its failure to properly train evidences a "deliberate indifference" to the rights of its inhabitants. *Id.* at 390, 109 S.Ct. at 1205.

▮▮▮ With these principles in mind, the Court will examine the allegations comprising Plaintiff's failure-to-train claims. Plaintiff here has not established that there was a need to train Sinford that he should not sexually assault inmates. Indeed, based on common sense as well as information provided by Washington County or the Maine Criminal Justice Academy, Sinford knew he should not have sexually assaulted Plaintiff. Sinford Dep. at 63–64. The written policies of the Washington County Sheriffs Department prohibits officers from engaging in "conduct unbecoming of an officer," which includes "the commission on or off duty of any specific act or acts, or relationships of immoral, improper, disorderly or intemperate personal conduct which reflects discredit upon the officer himself, upon his fellow officers, or upon the Sheriffs Department." Tibbetts Dep. at 55, 56; Brown Aff. ¶ 5. The Washington County Sheriffs Department manual of policies and procedures also prohibits employees from engaging in "the commission of any felony or misdemeanor, or the violation of the criminal laws or statutes of the United States or of any local jurisdiction." Tibbetts Dep. at 56; Brown Aff. ¶ 6. The record is replete with evidence that Sin-

ercise of their official responsibilities, the municipal policy makers should have known of

[it].") (citations, internal quotation marks, and alterations omitted).

ford received training on the policies and procedures of Washington County as well as training on what was appropriate conduct with, and supervision of, inmates. Brown Aff. ¶¶ 5–7, 9. The Court concludes that Washington County did what was necessary to train Sinford that he should not engage in sexual misconduct, including patently criminal sexual misconduct, with inmates. Thus, the Court does not find Defendants' training program to be inadequate and will grant summary judgment in favor of Washington County and Sheriff Tibbetts on Plaintiff's claim that failure to train Sinford caused a violation of her constitutional rights.

## B. Intentional Infliction of Emotional Distress (Count III)

 In order to establish a claim for intentional infliction of emotional distress under Maine law, a plaintiff must show that (1) defendant intentionally or recklessly inflicted severe emotional distress or was substantially certain that such distress would result from its conduct, (2) that the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable by civilized society, (3) that the actions of the defendant caused the emotional distress of the plaintiff, and (4) that the emotional distress that plaintiff suffered was so severe that no reasonable person could be expected to endure it. *Champagne v. Mid–Maine Medical Center*, 711 A.2d 842, 847 (Me. 1998). There is no evidence that either Defendant engaged in any conduct that was intended to harm Plaintiff or that would result in a substantial certainty that harm would befall Plaintiff. The Court will, therefore, grant Defendants' Motion for Summary Judgment on Plaintiff's claim

for intentional infliction of emotional distress.

## C. Negligent Infliction of Emotional Distress (Count IV)

 Under Maine law, a claim for negligent infliction of emotional distress requires a plaintiff to set forth facts from which it may be concluded that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was harmed; and (4) the breach caused the plaintiff's harm. *Curtis v. Porter*, 784 A.2d 18, 25 (Me.2001) (citation omitted). Although admitting that there was a "special relationship" between the parties in this case, Defendants contend that there is no evidence that any duty was breached. The Court disagrees and finds that on this record there are issues of fact as to whether Defendants breached their duty to Plaintiff which prevent the Court from granting Defendants' Motion for Summary Judgment on Count IV.[6]

## V. Conclusion

Accordingly, it is **ORDERED** that, consistent with the findings above, Defendants' Motion to Strike Affidavits and/or Portions of Affidavits of Linda Faas, Marni Taylor, Nicole Bouchard, Jamie Campbell and Marie Gabreil and Request for Sanctions be, and it is hereby, **GRANTED** in part and **DENIED** in part. It is further **ORDERED** that Defendants' Motion for Judgment on the Pleadings on Count II of Plaintiff's Complaint be, and it is hereby, **GRANTED**. It is further **ORDERED** that Defendants' Motion for Summary Judgment be, and it is hereby, **GRANTED** on Count III, **DENIED** on Count IV, and, consistent with the findings above, **GRANTED** in part and **DENIED** in part on Counts I and V.

---

**6.** Defendants have not raised the issue of immunity for the state law claims in their Motion for Summary Judgment and, therefore, the Court does not address the issue.

Plaintiff's claims which remain for trial are those parts of Counts I and V alleging a violation of her rights under federal and state law based on a municipal custom or practice, 42 U.S.C. § 1983 and 5 M.R.S.A. § 4681 *et seq.*, and Count IV alleging negligent infliction of emotional distress under Maine law.