**Jeffrey E. SIMPSON, Plaintiff**

v.

**PENOBSCOT COUNTY SHERIFF'S DEPARTMENT, et al.,
Defendants**

No. CIV 03–55–B–K.

United States District Court,
D. Maine.

Oct. 1, 2003.

Jeffrey E. Simpson, Newburgh, ME, Pro se.

Michael J. Schmidt, Wheeler & Arey, P.A., Waterville, ME, for Defendants.

## MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT[1]

KRAVCHUK, United States Magistrate Judge.

Jeffrey Simpson filed a 42 U.S.C. § 1983 action seeking remedy for alleged violations of his constitutional rights during his placement in administrative segregation in the Penobscot County Jail during the spring of 2002. In particular he claims that his right to privacy, right to medical attention, and his right to seek redress were infringed. The defendants in this action, Glenn Ross, Cheryl Gallant, Richard Clukey, and the Penobscot County Sheriff's Department now move for summary judgment. (Docket No. 13.) Simpson has not responded. I now **GRANT** the defendants' motion because, upon review of their pleadings, I conclude that they are entitled to judgment as a matter of law on all three claims.

### *Summary Judgment Standard*

■ The defendants are entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and the defendants are "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.* I review the record in the light most favorable to Simpson, the mute opponent of summary judgment, and I indulge all reasonable inferences in his favor. *See Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir.2000). However, the reality that Simpson has failed to place a single one of the defendants' facts in dispute means that I deem the properly supported facts as admitted, *see Faas v. Washington County*, 260 F.Supp.2d 198, 201 (D.Me.2003). Simpson's *pro se* status does not relieve

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

him of his duty to respond, *see Parkinson v. Goord*, 116 F.Supp.2d 390, 393 (W.D.N.Y.2000) ("[P]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment"), nor alter the Court's obligation to fairly apply the rules governing summary judgment proceedings, *see* Fed.R.Civ.P. 56; Dist. Me. Loc. R. Civ. P. 56.

### Discussion

#### Relevant Background Facts

In late March 2002 an inmate reported to the Penobscot County Jail staff that Jeffrey Simpson had fashioned a shank or homemade knife and intended to use it on a staff member. A shank was discovered in Simpson's block during a block search. Also during this time period Simpson threw his food tray at another inmate and charged staff members and other inmates (including the informant who had reported Simpson vis-à-vis the shank). As a consequence of this behavior, the jail administrator, defendant Richard Clukey, unsuccessfully sought Simpson's transfer out of the jail.

The transfer initiative having failed, Simpson, who at the time was already classified as maximum security, was moved from the general population to administrative segregation to prevent him from harming staff or other inmates. He was placed in an observation cell in the holding cell area. Clukey also issued an order indicating that Simpson was being placed in administrative segregation for safety and security reasons as a consequence of threats to staff and inmates, the possession of the shank, and various other disciplinary infractions. This order placed a number of limitations on Simpson and identified a number of precautionary measures to be employed when Simpson had access to jail staff: ordering that a minimum of two correction officers be present when Simpson's door was to be opened; requiring Simpson to go back to his cell when meals were to be served; allowing mace to be drawn when serving Simpson's meals; and calling for a search of Simpson's cell once a day.

#### Right to Privacy

In his complaint Simpson alleges that he was placed in administrative segregation from April 30, 2002, through May 16, 2002. He states that he was situated in holding Cell 120 and that this was the only holding cell that did not have a partition next to the toilet to provide privacy. In fact, Simpson avers, the toilet was situated in a manner that three female inmates in Cell 123 could, at separate intervals, have a direct view of Simpson while he was performing bodily functions.

The defendants' uncontroverted statement of material facts reveals the following about this claim. On April 30, 2002, Simpson was placed in Cell 120 where he stayed until May 16. Cell 120 was one of three cells in the holding area that allow complete visual access to the inmate anywhere in the cell. The other two such cells, numbers 122 and 123, do not have toilets and are used to house special management inmates or inmates in crisis. These categorizations would include inmates on suicide watch or whose emotional state is such that they needed to be placed in such a cell for their own protection or the protection of others.

Simpson was placed in Cell 120 because of the perceived threat to jail staff in contact with him Cell 120 was the best place to manage Simpson because staff could view Simpson before entering the cell or prior to opening the door to let Simpson out. Other cells in the holding area, other than the special management cells, do not afford the same advantage because they are equipped with either a

privacy partition or a toilet situated behind a half wall. Cell 120 is situated across and at an angle from Cell 123. The toilet in Cell 120 is along the front wall where the cell door is located and the view between the two cells in obstructed by a cement pillar located in the day room area.

It was not until Simpson submitted his privacy-related grievance (as well as others) in September 2002 that the defendants had any notice of Simpson's concern about his privacy while using the toilet. In response to these grievances, Clukey circulated a memorandum to all shift commanders inquiring whether or not they had knowledge or information relating to Simpson's claims. The responses from the shift supervisors indicated that not one of them recalled Simpson making any comments, complaints, or requests regarding his lack of privacy.

Simpson would have had access to the shift supervisors on their daily tours of the facility because a shift supervisor would have been in to inspect the holding cell during each of their three daily shifts. In seventeen days this would have allowed Simpson to raise with the shift supervisors the issues he complained of in his September 2002 grievances fifty-one times. After his release from administrative segregation and prior to being transferred to Windham, Simpson submitted two grievances and three inmate request forms. None of the grievance forms, request forms, or letter submitted by Simpson between April 30, and May 30, mention, reference, or identify that Simpson was

viewed by female inmates while housed in Cell 120.[2]

After Clukey received Simpson's grievance in September 2002, one of the shift supervisors was assigned to check if an inmate housed in Cell 123 would be able to see an inmate on the toilet in Cell 120. At this juncture it was discovered that an inmate housed in Cell 123 who went to the far right side of the cell door window could have a partial view of someone sitting on the toilet in Cell 120. When this information was provided to Clukey he asked a staff member to see if there was a way to remedy the problem without impeding complete staff observation of an inmate in Cell 120. The solution arrived at was the placement of a removable piece of magnetic paper over the lower door window. Prior to this complaint by Simpson, the jail had never had a complaint regarding a lack of privacy in that cell and not one of the defendants had knowledge that inmates in Cell 123 could obtain a view of an inmate using the toilet in Cell 120 until Simpson raised the concern in September 2002.

The defendants conceptualize this claim as one seeking redress for the deprivation of a "right to privacy" conferred by the Fourth Amendment. However, Simpson's allegations and the undisputed material facts simply do not justify such a voyage into somewhat murky Constitutional waters. There is no factual support for the conclusion that any jail staff members, much less the named defendants, were aware in April and/or May 2002 that

---

2. Simpson alleges that he asked corrections officers for a grievance form on three different occasions in hopes of addressing this issue. He asserts that he was met only with responses that this was not a grievable issue, that the staff would get back to him, or that the staff did not have time to let him out of his cell. However, Simpson's failure to respond to this motion and to substantiate these claims with record evidence means I could only credit these allegations if I take the defendants' acknowledgement of these allegations as admissions. Even if I were to do that, there is no support for the fact that the named defendants had any direct or indirect knowledge of Simpson's privacy related complaints until September 2002.

Simpson was viewable by female inmates during his use of the toilet. When the matter was brought to the attention of Clukey upon Simpson's return to the jail in September 2002, the privacy problem in Cell 120 was investigated and mitigated.

 In my search for the appropriate legal prism through which to view this claim, the United States Supreme Court's decision, *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), is a beacon in the fog. In *Daniels* the plaintiff alleged that a prison custodian left a pillow on the stairs and that the plaintiff slipped on it and was injured. *Id.* at 338, 106 S.Ct. 662. Overruling in part *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the *Daniels* Court concluded "that the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Id.* The Court reasoned:

> We think that the actions of prison custodians in leaving a pillow on the prison stairs, or mislaying an inmate's property, are quite remote from the concerns just discussed. Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law.

> The Fourteenth Amendment is a part of a Constitution generally designed to allocate governing authority among the Branches of the Federal Government and between that Government and the States, and to secure certain individual rights against both State and Federal Government. When dealing with a claim that such a document creates a right in prisoners to sue a government official because he negligently created an unsafe condition in the prison, we bear in mind Chief Justice Marshall's admonition that "we must never forget, that it is *a constitution* we are expounding," *McCulloch v. Maryland,* 4 Wheat. (17 U.S.) 316, 407, 4 L.Ed. 579 (emphasis in original). Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society. We have previously rejected reasoning that " 'would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States,' " *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405(1976), quoted in *Parratt v. Taylor,* 451 U.S. at 544, 101 S.Ct. 1908.

*Id.* at 332, 4 Wheat. 316. The court emphasized that the only tie between the facts of the plaintiff's case and "anything governmental in nature" was the fact that the defendant was a sheriff's deputy and the plaintiff was an inmate confined in that jail. *Id.* at 332, 4 Wheat. 316. And, "while the Due Process Clause of the Fourteenth Amendment obviously speaks to some facets of this relationship," the Court concluded that "its protections [were not] triggered by lack of due care by prison officials." *Id.* at 332–33, 4 Wheat. 316 (noting that the same principle applied to medical malpractice and (certain) false imprisonment claims against state employees); *see also Reid v. New Hampshire,* 56 F.3d 332, 341 (1st Cir.1995).[3] For these

---

**3.** It is not clear, as the defendants concede, whether Simpson was a pre-trial detainee at the time of the alleged toilet exposure or whether he stood convicted of a crime and

reasons I conclude that Simpson has no constitutional claim stemming from the invasion of his privacy during his use of the toilet in Cell 120.

### Right to Seek Redress

The defendants' uncontroverted facts with respect to Simpson's right to seek redress claim, above and beyond those stated above, are as follows.[4] Simpson left the jail on May 30, 2002, and spent the summer months at the Maine State Prison in Windham. In September of 2002, he returned to the Penobscot County Jail and filed a number of grievances. These grievances claimed that while he was in Cell 120 he was viewed by three female inmates while he was using the toilet; that his shoes were taken from him; that the holding cell was filthy with urine, vomit, feces, and blood; that he was not allowed to have writing materials, law books, pen, or pencil to prepare grievances; and that he was denied outside recreation, visits, and phone use.

As already noted, in response to these grievances, Clukey circulated a memorandum to all jail shift commanders inquiring whether or not they had knowledge or information relating to Simpson's claims. The shift commander informed Clukey that Simpson was allowed access to grievance and request forms, that he was allowed out of his cell to make phone calls, that he was allowed access to law books, and, although it is a fact difficult to prove, that the holding cell area was not covered with blood, feces, and urine.

After hearing back from his shift supervisors, Clukey advised Simpson that the shift supervisors were unaware of any information that supported his allegation, that they did not know of any complaints made by Simpson while housed in Cell 120, that the four to five month time delay in filing the grievances made it impossible to

---

was serving his sentence as a consequence. The defendants agreed to have Simpson's claims analyzed as if he were a pre-trial detainee. However, Simpson's allegations fall far short of the type of claims that implicate the "conditions of confinement" vein of the Fourteenth Amendment due process clause. *See Bell v. Wolfish*, 441 U.S. 520, 535–36, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *see also Ingraham v. Wright*, 430 U.S. 651, 671, 97 S.Ct. 1401, 51 L.Ed.2d 711(1977) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment."). However, even if I were to undertake to weigh the governmental objectives against the condition of pre-trial detention as envisioned by *Bell*, 441 U.S. at 539, 99 S.Ct. 1861, there is no factual support for a conclusion that Simpson's exposure to other female inmates while on the toilet (as opposed to the desire that he be at all time visible to jail staff) was necessitated by a professed penological objective. In other words, the injury of which Simpson complains was not an intended prison condition but a negligent oversight.

Simpson's allegations also do not amount to a claim for an impermissible "search and seizure" as Simpson is complaining of the searching eyes of co-inmates rather than guards.

4. The defendants are not arguing that Simpson did not adequately exhaust his administrative remedies prior to bringing this suit as required by 42 U.S.C. § 1997e(a). Along this line, the defendants state that Simpson acknowledges that he was provided with grievance forms after he grieved the lack of grievance forms on May 26, 2002. Simpson conceded that he was aware at this time that he was required by the Prison Litigation Reform Act to exhaust his administrative remedies but did not chose to file a grievance between May 26, and May 30, because "the point was moot. I was already out of segregation. I wasn't being viewed no more." (Simpson Dep. at 32, 34, 36.)

verify the situation complained of, and that an earlier airing of the grievance would have facilitated a productive investigation.

Other than grievances, Simpson submitted two "request forms" between April 20, 2002, and May 16, 2002. He also sent a letter to the jail administrator pertaining to the jail's violation or noncompliance with the Maine Department of Corrections standards, that alleged that his due process rights were being violated (with no reference to his privacy concerns). Jail records further reflect that Simpson was let out of his cell for purposes of preparing documents on six occasions between May 1, 2002 and May 15, 2002, for purposes of writing letters, requesting law books, and requesting a disciplinary appeal.

Penobscot County Jail Policy F160, entitled, "Inmate Grievances," identifies that jail staff will provide inmates with a grievance form when the inmate wants to report a grievance that is consistent with the definition of a grievance. Notwithstanding Policy F160, upon receipt of Simpson's May 26, 2002, grievance, jail personnel were instructed to give inmates grievance forms upon request regardless of whether it met the definition of a Policy F160 defined grievance. Request forms are provided inmates when jail staff cannot provide an in-person response to an inmate request. So, even assuming that there were times that Simpson did not have access to the grievance process, he would have always had access to the inmate request process and Simpson could have submitted a request form pertaining to his lack of privacy or any of the other conditions he subsequently chose to complain about with respect to his stay in Cell 120.

Based on these undisputed facts it cannot be said that Simpson was denied access to the jail's grievance process. Nothing need be said about the legal parameters or the questionable constitutional stature of a denial of right to seek redress claim as postured by Simpson.

### Deliberate Indifference to Medical Needs

In his complaint Simpson alleges that during this period of privacy violation and grievance deprivation he suffered from anxiety and panic attacks, post-traumatic stress syndrome, and depression and that these conditions went undiagnosed and untreated. Simpson expands that he suffered several anxiety attacks, nightmares, and depression, and these symptoms/conditions were severely aggravated by the hopelessness resulting from his inability to communicate with the defendants about his exposure to female inmates while performing his bodily functions. The defendants failed to recognize, treat, or provide psychotropic medication for Simpson's psychological conditions. On March 17, 2003, Simpson was diagnosed with post-traumatic stress syndrome, anxiety, panic attacks, and depression by Doctor Kenneth Kindya.

The undisputed material facts propounded by the defendants concerning Simpson's denial of medical care claim are as follows. Simpson was seen *after* the completion of his incarceration in March 2003 by Kindya towards the end of obtaining an evaluation of Simpson for disability benefits. According to Simpson during his deposition, Kindya saw Simpson once, asked him questions about his childhood, and then diagnosed Simpson as having post-traumatic stress syndrome caused by the events from his childhood. (Simpson Dep. at 19–21.) Simpson also states that Kindya diagnosed him with anxiety and depression. (*Id.*)

Simpson acknowledges that he never sought treatment at the jail or anywhere for any of these conditions. Simpson never told the jail staff that he was suffering from anxiety or depression and never re-

quested to see a nurse because, according to Simpson, he did not know he suffered from a mental problem or psychological disorder. (*Id.* at 19–25.) Because of this lack of awareness of his mental problems at the time of intake, Simpson answered "no" when asked whether he had any medical conditions of which the jail should be aware.

The constitutional standard for a deliberate indifference claim has been framed by the United States Supreme Court in two cases: *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). *Estelle* provided that the Eighth Amendment protection places upon the government an "obligation to provide medical care for those whom it is punishing by incarceration." 429 U.S. at 103, 97 S.Ct. 285. The Court observed: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.; see also Helling v. McKinney*, 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) ("[T]he substantive limits on state action set by the Eighth Amendment," when it "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs" including food and medical care).

In *Farmer* the Court articulated a two-prong standard a plaintiff must meet to hold a prison official liable for Eighth Amendment claims of the type framed by Simpson. First, the deprivation alleged must be "objectively 'sufficiently serious.'" 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Second, under *Farmer*, the defendant must have a culpable state of mind, which means that the defendant was deliberate in his indifference to the inmate's health or safety. *Id.*

■ Assuming that Simpson's mental condition meets the first *Farmer* prong (and ignoring the limitation place on recovery for nonphysical injury by 42 U.S.C. § 1997e(e)), there is no factual support whatsoever in this record for a conclusion that the defendants were indifferent, let alone deliberately so, to Simpson's mental health during the time he was incarcerated at the jail. Indeed, the record indicates that neither the jail staff nor Simpson were aware of any mental health problems in need of treatment during the time that Simpson was at the jail. The *Farmer* analysis surely does not require jail and prison personnel to be clairvoyant vis-à-vis inmate physical and mental wellbeing. Accordingly, this claim, too, has no merit.

### Conclusion

For these reason I **GRANT** the defendants' unopposed motion for summary judgment on all three claims tendered by Simpson in his complaint.

***So Ordered.***